UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ROSE CREWBOAT SERVICES, INC.     CIVIL ACTION

VERSUS             NO. 17-7052

WOOD RESOURCES, LLC      SECTION "R" (4)

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## I. INTRODUCTION

This case arises out of an alleged accident in the Mississippi River.[1] Plaintiff claims that its vessel, the M/V SAM B, was damaged when it hit an unmarked and unlit dredge pipeline early on the morning of July 23, 2016.[2] On July 24, 2017, plaintiff filed a lawsuit in this Court seeking damages for repairs to the vessel, as well as interest and costs.[3] Plaintiff alleges that defendant's negligence caused plaintiff's damages.[4] The Court has jurisdiction over this matter under 28 U.S.C. § 1333. The parties agreed to try this case on the briefs in lieu of a live trial.[5] After reviewing the parties' trial briefs and exhibits, the Court rules as follows.

---

[1] *See* R. Doc. 1.
[2] *Id.* at 2 ¶¶ 5-7.
[3] *Id.*
[4] *See id.* at 4 ¶ 16-17.
[5] *See* R. Doc. 56.

## II.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.   The Accident

In the early morning hours of July 23, 2016, Captain George Bonck navigated the M/V SAM B, an aluminum crewboat, down the Mississippi River.[6]  Around 4:00 a.m., after dropping off a crew at the vessel GEMINI for his employer, Rose Crewboat Services, Capt. Bonck steered the crewboat around a barge line close to the GEMINI.[7]  Capt. Bonck testified at his deposition that as he navigated around the barge line, he hit an unmarked and unlit dredge pipe near the Wood Resources' dock.[8]  He stated: "as I came to about right around the side of this barge to come make my approach to the landing, and that's where I hit the dredge pipe.  There [were] no lights, there was nothing marked."[9]  Capt. Bonck described the dredge pipe as "below the surface of the water . . . where you could barely see it."[10]  Capt. Bonck also testified that there was a dredge very close by in the middle of the river, although he could not see where the pipeline was attached.[11]

---

[6]    *See* Plaintiff's Exhibit 3 at 12:17-13:4.
[7]    *See id.* at 14:2-14:13.
[8]    *Id.*
[9]    *Id.* at 14:8-13.
[10]   *Id.* at 13:21-25.
[11]   *Id.* at 11:12-16.

Capt. Bonck attested that immediately following the accident, the M/V SAM B was approached by a small boat driven by a Wood Resources employee.[12] The employee asked what happened, to which Capt. Bonck responded, "I believe I hit your pipeline," and inquired why it was not marked.[13] Capt. Bonck put the boat in gear and eased up to the landing.[14] At this point, the vessel was taking on water.[15] Once he was on land, Capt. Bonck confirmed that he had hit a dredge pipe. He testified:

> I got off the boat and once I tied it up and walked around and I was able to see the pipeline from the landside because I said it went in the high grass, you couldn't see it from the boat, because it went down in the water and it went to the grass, but once I was able to get on land, they had the pipe way on land. You [were] able to see the other end of the pipe.[16]

Capt. Bonck then contacted Kelly Sauerwin, who was a supervisor at Wood Resources. Capt. Bonck stated that Sauerwin apologized and stated that he "was going to look into it about the guys not marking their pipeline."[17]

---

[12]     *See id.* at 21:1-5.
[13]     Plaintiff's Exhibit 3 at 21:1-8; *See also* Plaintiff's Exhibit 1 at 9 ("I notified a woods dredging employee of the damage . . . .")
[14]     *See id.* at 21:9-20.
[15]     *See id.*
[16]     *Id.* at 25:5-13.
[17]     *Id.* at 22:15-17.

According to Capt. Bonck, Sauerwin added, "Anything we can do to help, we will be willing to help."[18]

Following the accident, Capt. Bonck called his employer, Charles Augustine, to report what had taken place.[19] Augustine came to the Wood Resources dock and observed significant activity involving various dredge pipes in the area.[20] Augustine stated that he saw:

> a big batture of mud piled up and they made roads out of it and they had the thing blockaded with the pipes they were dragging from one side to the other and in the water, and you couldn't even get out of there to get to the water.[21]

He also saw employees moving dredging pipes across the land.[22] When asked at his deposition about the dredge pipe in the water, Augustine stated that "George Bonck and the people that went out there to fix the boat, [and] the crane operator" told him there were dredge pipes in the water.[23]

Defendant counters Capt. Bonck's first-hand account with evidence of its general practices. Although Wood Resources does not dispute that it was engaged in a dredging operation in the area where the M/V SAM B struck an

---

18      *Id.* at 22:18-19.

19      *See id.* at 25:14-21.

20      *See* Plaintiff's Exhibit 2 at 32:17-33:14.

21      *Id.* at 14:22-15:4.

22      *See id.* at 34:2-34:11.

23      *Id.* at 34:24-25.

object in July 2016, it points to evidence that it completed that project on July 15, 2016, about a week before the accident.[24] The evidence defendant points to includes a log from July 15, 2016, stating "finished pit, called Kelly,"[25] a notice sent to the Department of Wildlife and Fisheries and the accompanying email,[26] and a partially completed affidavit stating that the dredging project ended on July 18, 2016.[27] Defendant's key witness, William Smith, was an employee who worked on dredging projects for Wood Resources. He testified in his deposition that when he finishes a dredging project, he generally takes the pipe out of the water "first thing," or at least "within 24 hours."[28] Based on this practice and the log, Mr. Smith concluded that they had taken the dredge pipe in question out of the water before July 23, 2016.[29] But Mr. Smith was not present at the time of the accident, nor did he recall specifically removing the dredge pipe.[30] Mr. Smith also testified that the pipe was packed up later to be moved, but similarly did not specifically recall packing up the pipe.[31]

---

[24]    R. Doc. 59 at 2-5.
[25]    Defendant's Exhibit 2.
[26]    Defendant's Exhibits 3 and 4.
[27]    Defendant's Exhibit 5.
[28]    Defendant's Exhibit 1 at 36:13-22.
[29]    *See id.* at 36:13-37:1.
[30]    *See id.* at 15:13-18; 31:7-12.
[31]    *See id.* at 31:7-12.

Based on the preceding evidence, the Court credits Capt. Bonck's testimony and finds that the M/V SAM B hit Wood Resources' unmarked dredge pipe during the early morning hours of July 23, 2016. Capt. Bonck is the only eyewitness to the accident who testified to what happened. He recorded the incident contemporaneously in Rose Crewboat's logs.[32] Capt. Bonck also told another witness, Charles Augustine, that he had hit an unmarked dredge pipe shortly after this occured.[33] Augustine's testimony supports Capt. Bonck's. Augustine stated that upon his arrival at the Wood Resources' property, he saw numerous dredge pipes being moved across property near the Wood Resources' dock, suggesting some dredge pipes were in use.[34] And he noted that Capt. Bonck *and others* told him that they saw a dredge pipe in the water.[35] All of this supports Capt. Bonck's testimony.

Defendant argues that Capt. Bonck is not a credible witness, pointing to several asserted inconsistencies in his testimony.[36] The Court finds these arguments to be without merit. Capt. Bonck's testimony is supported by

---

[32]   *See* Plaintiff's Exhibit 1 at 9. ("While leaving the dock at woods 110 I ran over a[n] unmarked and unlit pipeline that was below the water and it has caused one of my wheels to fall off and caused damage to the shaft.").

[33]   *See* Plaintiff's Exhibit 3 at 26:25-27:12; *See also* Plaintiff's Exhibit 2 at 32:6-12.

[34]   *See* Plaintiff's Exhibit 2 at 32:23-34:11.

[35]   *Id.* at 34:22-25.

[36]   R. Doc. 59 at 5-6.

other witnesses and contemporaneous records. Moreover, the "inconsistencies" Wood Resources relies on are conclusory or are explained when the record is considered in context. In any event, they are not fatal to Capt. Bonck's credibility. For example, Wood Resources alleges that Capt. Bonck "claims SAM B ran into Wood's dredge pipe long after it had been removed from the river."[37] This conclusory assertion assumes that the Court credits Wood Resources' evidence of its regular practices over Capt. Bonck's testimony. But the Court finds Capt. Bonck's first-hand account more persuasive than defendant's evidence.

Wood Resources also points to Capt. Bonck's statement that he spoke to Sauerwin several times on the day of the accident.[38] Defendant argues that this contradicts what Capt. Bonck wrote in M/V SAM B's logs. But the log from the day of the accident, which Wood Resources points to, states only: "I notified a Woods dredging employee of the damage and he gave me his supervisor 'Mr. Kelly [Sauerwin's]' number."[39] The logs from the day of the accident therefore do not suggest that Capt. Bonck could not reach Sauerwin. The logs from July 25, 2016—several days later—state: "I called Mr. Kelly [Sauerwin] several times and he didn't answer, I texted him and no

---

[37]    *Id.*
[38]    *Id.*
[39]    Plaintiff's Exhibit 1 at 9.

reply."[40]   But it is entirely consistent that Capt. Bonck could speak to Sauerwin several times on the day of the accident and be unable to reach him two days later.

Wood Resources also points out that M/V SAM B's log shows that a crane was used to lift the M/V SAM B on July 25, 2016, but the invoice is dated July 26, 2016.  Defendant suggests that this means that the vessel's logs were prepared after-the-fact or doctored.  The invoice could have been issued after the service was rendered.[41]  In any event, the Court does not find a small discrepancy between the log and the invoice to be fatal to Capt. Bonck's credibility as a witness about what happened a few days earlier. Wood Resources' other contentions that Capt. Bonck's first-hand account cannot be trusted similarly do not materially undermine Capt. Bonck's credibility.  The Court therefore rejects Wood Resources' argument and credits Capt. Bonck's testimony.

Defendant provides no conflicting eyewitness accounts to contradict Capt. Bonck.  It is particularly notable that defendant did not offer testimony from Kelly Sauerwin, who was the supervisor on duty at time of the accident.[42]  Defendant also did not provide the testimony of the employee

---

[40]     Plaintiff's Exhibit 1 at 11.
[41]     R. Doc. 59 at 6.
[42]     *See* R. Doc. 57 at 10.

who initially went out to the M/V SAM B, or any other employee from Wood Resources who was present at the time of the accident. Defendant's primary witness, William Smith, has no personal knowledge of the events of July 23.[43] He did not work the shift when the accident took place, but rather started work at 7:00 a.m.[44] Although Smith testified that he would have been involved in the removal of the dredge pipe from the river, he has no specific recollection of removing it.[45]

Wood Resources' reliance on records indicating that the dredging project was completed eight days before the accident and Smith's testimony that Wood Resources usually pulled pipes from the water as soon as a job was completed, is weaker and less persuasive evidence than Capt. Bonck's first-hand account. And defendant offered no records documenting that it had removed the pipe or who did the removal. In sum, the Court finds Capt. Bonck's testimony more credible than the general practices testimony presented by defendant, and therefore finds by a preponderance of the evidence that the M/V SAM B did hit an unlit and unmarked dredge pipe early in the morning of July 23, 2016.

---

[43] *See* Defendant's Exhibit 1 at 15:6-18.
[44] *See id.* at 14:6-14.
[45] *See id.* at 31:7-12.

Nor can it be argued that the pipe did not belong Wood Resources. It is undisputed that Wood Resources was engaging in dredging activities in the area around the time of the allision. Wood Resources' primary witness, William Smith, testifies as much.[46] Capt. Bonck's testimony indicates that when he notified Wood Resources employees of the accident, none of them, including Sauerwin, denied it was a Wood Resources pipe.[47] And Augustine testified to extensive activity involving pipes near the Wood Resources dock, stating "they had the thing blockaded with pipes they were dragging from one side to the other and in the water."[48] The Court therefore finds by a preponderance of the evidence that the pipe into which the M/V SAM B allided belonged to Wood Resources.

## B.     The Aftermath

Once Capt. Bonck successfully tied up the boat, it required repairs. Rose Crewboat hired Archer Daniels Midland to use a crane to move the vessel onto its barge for temporary repairs, as indicated in Rose Crewboat's logs and the Archer Daniel Midland invoices.[49] After these repairs, Capt. Bonck testified that he tried to make a run to the GEMINI, but when he put

---

[46]     *See* Defendant's Exhibit 1 at 14:15-18.
[47]     *See* Plaintiff's Exhibit 3 at 24:20-23.
[48]     Plaintiff's Exhibit 2 at 14:23-25.
[49]     Plaintiff's Exhibit 1 at 11-12, 15, 17-18.

the engine in reverse, it came loose, again making the boat unusable.[50] The Archer Daniels Midland crane was then used again for more temporary repairs.[51] Archie Coulon, the owner and president of the company which did the repairs, Bayou Machine & Fabrication, testified that these repairs were temporary repairs designed to get the boat to the shipyard.[52] The vessel was eventually brought to the Bayou Machine & Fabrication shipyard for permanent repairs.[53] Because of the accident, Rose Crewboat alleges it incurred damages of $17,216.[54] These damages consisted of $1,800 in temporary repairs made to the vessel, $11,720 in permanent repairs made to the vessel, and $3,696 in crane expenses incurred because of the damages to the vessel.[55]

### C.    Maritime Negligence

This Court has jurisdiction over this case via 28 U.S.C. § 1333, and plaintiff's claims in this matter are admiralty claims pursuant to Rule 9(h) of the Federal Rules of Civil Procedure. The Court therefore applies general maritime law in analyzing plaintiff's claims. Plaintiff makes two arguments.

---

[50]    *See* Plaintiff's Exhibit 3 at 30:3-7.
[51]    *See* Plaintiff's Exhibit 1 at 17-18; Plaintiff's Exhibit 3 at 31:2-6.
[52]    *See* Plaintiff's Exhibit 5 at 12:5-16.
[53]    *See* Plaintiff's Exhibit 1 at 22; Plaintiff's Exhibit 5 at 7:1-9.
[54]    R. Doc. 57 at 1.
[55]    Plaintiff's Exhibit 1 at 17-18, 21-22.

First, it argues that Wood Resources negligently caused its damages by failing to comply with the Inland Navigation Rules concerning the duty to mark obstructions in the river, and is therefore per se negligent. Second, plaintiff argues that Wood Resources failed to adhere to a standard of reasonable care in marking its pipeline, and thus negligently caused Rose Crewboat's damages. The Court addresses each claim in turn.

### 1. *Per Se Negligence*

"The law is well established that violation of a statute which is intended to protect the class of persons to which a plaintiff belongs against the risk of the type of harm which has in fact occurred is negligence in itself." *Manning v. M/V 'Sea Road'*, 417 F.2d 603, 608 (5th Cir. 1969). "When a statute or regulation 'establishes a clear minimum standard of care,' 'the doctrine of negligence per se applies, [and] the general standard of care . . . is replaced by [the] specific rule of conduct established in the statute or regulation.'" *Targa Midstream Servs. Ltd. P'ship v. K-Sea Transp. Partners, L.P.*, 527 F. Supp. 2d 598, 602 (S.D. Tex. 2007) (citing *Dougherty v. Santa Fe Marine, Inc.*, 698 F.2d 232, 234 (5th Cir. 1983)). And "failure to follow any Coast Guard regulation which is the cause of an injury establishes negligence per se." *Dougherty*, 698 F. 2d at 234 (citations omitted).

Rose Crewboat has identified 33 C.F.R. § 83.27(d) as a regulation that it argues imposed a duty upon Wood Resources to mark its submerged dredge pipe for passing vessels. That regulation states: "A vessel engaged in dredging or underwater operations, when restricted in her ability to maneuver, shall exhibit the lights and shapes prescribed in paragraphs (b)(i), (ii), and (iii) of this Rule." 33 C.F.R. § 83.27(d). Notably, this regulation applies only to vessels "engaged in dredging or underwater operations." *Id.* And while Capt. Bonck's testimony does establish that there was a submerged pipeline in the water, it does not establish that the pipeline was necessarily engaged in dredging or underwater operations. Capt. Bonck stated there was a dredging vessel in the middle of the river,[56] but he also stated that he observed a portion of it on land,[57] could not see where it was attached,[58] and never stated that it was engaged in dredging operations.[59] The Court therefore finds this regulation inapplicable here.

---

[56] Plaintiff's Exhibit 3 at 21:1-5.

[57] *See id.* at 25:5-13.

[58] *See id.* at 11:16-17.

[59] Moreover, Wood Resources certified to the Department of Wildlife and Fisheries that the dredging was complete, although the certification to the government did not speak to the removal of the dredge pipe. *See* Defendant's Exhibit 3 ("Work was completed on 07/15/16.").

Plaintiff also identifies an alternative, catchall regulation that applies to the "Other obstructions existing on or in the navigable waters . . . ."[60] *See* 33 C.F.R. § 64.03(a)(3).[61] Other courts have held that this regulation applies to dredge pipelines. *See Higman Towing Co. v. Dredge Tom James*, 637 F. Supp. 925, 929 (E.D. Tex. 1986). This regulation requires the owner of an obstruction to "mark it immediately with a buoy or beacon during the day or a light at night." 33 C.F.R. § 64.11(a). Here, the pipeline undoubtably acted as an obstruction on navigable waters, as it prohibited vessels, such as the M/V SAM B from navigating through the Mississippi. And as the Court has found, it was unmarked at the time of the allision. The Court therefore finds by a preponderance of the evidence that Wood Resources violated 33 C.F.R. § 64.11(a), and is therefore negligent per se.[62]

---

[60] R. Doc. 57 at 14.

[61] Although the regulation exempts "Dredging pipelines subject to Subchapter E of this Chapter," 33 C.F.R. § 64.03(b)(1), the Court has already found the relevant regulations in Subchapter E are not applicable to this pipeline as testimony does not establish that it was engaged in dredging operations.

[62] Although neither party raises the issue, an argument can be made that the "Pennsylvania Rule" applies in this case. The Pennsylvania Rule states that when a ship is in violation of a statutory rule that is designed to prevent collisions and such a collision occurs, the burden rests upon defendant to show that it could not have been at fault. *See The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136 (1873). The Fifth Circuit has applied the rule in cases involving allisions. *See Trico Marine Assets Inc. v. Diamond B. Marine Servs. Inc.*, 332 F.3d 779, 786 (5th Cir. 2003). Because the Court finds that plaintiff has proved that defendant violated a regulation designed to prevent

## 2.    *Failure to Take Reasonable Care*

As an alternative to negligence per se, Rose Crewboat argues the defendant could be held liable under maritime negligence for failing to adhere to a reasonable standard of care. "To establish maritime negligence, a plaintiff must 'demonstrate that there was a duty owed by defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between defendant's conduct and the plaintiff's injury.'" *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000) (quoting *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991)).    "Even without a statutory violation, liability may be imposed simply where there is negligence." *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 364 (5th Cir. 2006).

The analysis of duty and breach are interrelated, as they turn on the question of foreseeability.  "Under maritime law, a plaintiff is owed a duty of ordinary care under the circumstances."  *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010).  "The determination of the existence and scope of a duty involves a number of factors, including most

---

just such an allision as took place here, the burden shifts to defendant to prove "not merely that [its] fault might not have been one of the causes, or that it probably was not, but that it could not have been." *The Pennsylvania*, 86 U.S. (19 Wall) at 136.  This is a burden that defendant cannot meet with the general practices evidence it has put forth.

notably the foreseeability of the harm suffered by the complaining party." *Id.* (quoting *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987)) (internal quotations omitted). A breach of the duty of ordinary care can be found when defendant acts negligently, or without such care. *See, e.g., Movible Offshore, Inc. v. M/V Wilken A. Falgout*, 471 F.2d 268, 274 (5th Cir. 1973) ("It is enough that the vessel sought to be charged had at its disposal safe means to avoid the collision and *negligently* failed to do so." (emphasis in original)).

Here, the Court finds the defendant breached the duty of ordinary care it owed to plaintiff, and is therefore also liable under a theory of maritime negligence. The Court has found that defendant left an unmarked dredge pipeline in the Mississippi River as a consequence of its dredging operations. The pipeline was an obstruction to the boats navigating the river, including the M/V SAM B. This is particularly true because the pipeline, although submerged, still hovered near the water's surface, which increased the chance of an allision.[63] Moreover, the Court has found that the pipeline was unmarked. Failing to mark the pipeline significantly increases the risk that a passing vessel will hit it. Wood Resources was clearly aware of this risk, because Smith's testimony establishes that its ordinary practice was to mark

---

[63]    *See* Plaintiff's Exhibit 3 at 13:17-14:1.

a submerged pipeline to avoid an allision.[64]    Other courts have similarly found that failure to properly mark a submerged obstruction is negligent. *See, e.g., Tidewater Marine, Inc. v. Sanco Int'l., Inc.*, 113 F. Supp. 2d 987, 1001 (E.D. La. 2000).

## D.    Defendant Caused the Plaintiff's Damages

For Rose Crewboat to recover its alleged damages, it also must prove that Wood Resources' negligence was the cause of those damages.  "Under general maritime law, a party's negligence is actionable only if it is a 'legal cause' of the plaintiff's injuries." *Donaghey v. Ocean Drilling & Expl. Co.*, 974 F.2d 646, 649 (5th Cir. 1992).  A legal cause must be more than "but for" causation; defendant's negligence must be a "substantial factor" in plaintiff's injury. *See id.*  In the case of a collision or other marine casualty, when the damaged vessel is not a total loss, the owner is entitled to recover the reasonable cost of repairs necessary to restore it to its pre-casualty condition. *Gaines Towing & Transp. Inc. v. Atlantia Tanker Corp.*, 191 F.3d 633, 636 (5th Cir. 1999).  Thus, if the allision with the dredge pipe was a substantial factor in the damage done to the vessel, plaintiff is entitled to damages for the repairs to the M/V SAM B.

---

[64]    *See* Defendant's Exhibit 1 at 43:21-25.

As an initial matter, defendant does not seem to contest causation for the temporary repair costs and the cost of using ADM's crane immediately following the accident, beyond its argument that Wood Resources was not negligent. Rather, Wood Resources argues that plaintiff did not pay the invoices associated with these damages, and therefore cannot recover.[65] But plaintiff has provided the affidavit of Charles Augustine, which states that it paid all the relevant invoices in full.[66] Defendant offers no evidence that the invoices have not been paid. Therefore, the Court includes the $1,800 for temporary repairs and the $3,696 in crane-use costs in plaintiff's damages.

Wood Resources more vigorously contests the $11,720 in permanent repairs that Rose Crewboat claims. Defendant argues that, even if it negligently left an unmarked line in the water, the need for the repairs to the M/V SAM B arose due to wear and tear on the vessel rather than the allision.[67] This argument is not supported by the weight of the evidence. Bayou Machine and Fabrication, Inc., performed the M/V SAM B's repairs. Although its president, Archie Coulon, testified that he could not determine with certainty whether the vessel required certain of the repairs because of

---

[65] R. Doc. 59 at 10.
[66] Plaintiff's Exhibit 1 at 2.
[67] R. Doc. 59 at 8-10.

the accident or because of wear and tear,[68] Coulon's testimony does not establish that the vessel required immediate repair before the accident, except for $400 in damage to its tiller arm. Indeed, the vessel was functioning normally and traveling on the river regularly up until the day of the accident.[69]

Coulon testified that the vessel "definitely hit something" that caused substantial damage.[70] He emphasized that the vessel hit something "without a doubt, you know. Something went wrong for sure."[71] He further noted numerous items of damage to the M/V SAM B that were the result of the vessel hitting an object, and not simply wear and tear. For example, when asked about the damage to the vessel's stern tubes, which cost $3,400 to repair,[72] Coulon stated "I'm pretty sure that had something to do with . . . the accident, because you know, they . . . had a crack in the strut leg and what have you."[73] Similarly, with respect to the rudders, which cost $800 to repair, and the propellers, which cost $600 to repair,[74] Coulon stated: "I know he definitely hit something for the damage that it had with the rudders

---

68   *See* Defendant's Exhibit 10 at 8:1-4.
69   *See* Plaintiff's Exhibit 1 at 4-7.
70   Defendant's Exhibit 10 at 13:16-18.
71   *Id.* at 20:16-17.
72   Defendant's Exhibit 10 at 25.
73   *Id.* at 20:7-14.
74   Defendant's Exhibit 10 at 25.

and what have you, the propellers."[75]  Thus, the substantial damage to the boat from the accident was readily apparent regardless of prior wear and tear.

Coulin's testimony, when taken in conjunction with the testimony of Capt. Bonck, shows that the allision was a substantial factor in the need for the repairs.  Capt. Bonck testified that after the accident he had "no propulsion" in one engine, the vessel was "taking on water and . . . lost a wheel," the shaft came off, and the clutch came off.[76]  The sudden severe damage that Capt. Bonck describes is not consistent with the damage from wear and tear.

The totality of the evidence indicates that the damages are from the allision, not simply from wear and tear.  The Court therefore finds by a preponderance of the evidence that Wood Resources caused Rose Crewboat's damages.  Because the allision constituted a substantial factor in plaintiff's need for the permanent repairs, plaintiff may recover the "reasonable cost of repairs" of the M/V SAM B.  *Gains Towing & Transp. Inc.*, 191 F.3d at 635.  This amount is the full repair costs less the $400 cost of repairing the tiller arm, the need for which Coulin stated was due to wear and tear.

---

[75]     *Id.* at 13:16-18.
[76]     Plaintiff's Exhibit 3 at 21:9-25.

## E.    Interest and Attorney's Fees

In addition to the damages discussed above, plaintiff also requests interest and the costs of litigation.[77]  Interest is regularly allowed in maritime collision cases.  *Gulf Oil Co. v. Panama Canal Co.*, 481 F.2d 561, 570 (5th Cir. 1973).  No special circumstances exist which would cause the Court to deviate from this general rule.  Therefore, the Court will include interest in plaintiff's award.  However, under the so-called American Rule, litigants are generally responsible for their own fees.  *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 257 (1975).  The Court may, however, "assess fees as sanctions when the losing party has acted in bad faith, vexatious, wantonly, or for oppressive reasons."  *Moench v. Marquette Transp. Comp. Gulf-Inland, L.L.C.*, 838 F.3d 586, 595 (5th Cir. 2016) (quoting *Gate Guard Servs., L.P. v. Perez*, 792 F.3d 554, 561 & n.4 (5th Cir. 2015) (internal quotations omitted)).  Here, while defendant was ultimately unsuccessful in convincing the Court of its position, defendant did not act in "bad faith, vexatious, wantonly, or for oppressive reasons."  *Id.*  Therefore, the Court will not award the costs of litigation.

---

[77]    *See* R. Doc. 57.

## III.  CONCLUSION

For the foregoing reasons, the Court finds that defendant negligently left an unmarked line in the water on July 23, 2016.  Plaintiff's damages to its vessel were caused by defendant's negligence, except that the Court finds that the damage to the vessel's tiller arm was not caused by the accident. Accordingly, the Court hereby finds defendant liable to plaintiff for repairs to the M/V SAM B totaling $16,816.00 plus interest.

New Orleans, Louisiana, this __12th__ day of November, 2019.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE